Rosanna **COLMAN**, Plaintiff,

v.

Ricardo **VASQUEZ**, **Lt. Meredieth, and Warden Harding, Defendants.**

No. 3:99CV2446 (JBA).

United States District Court, D. Connecticut.

March 30, 2001.

Katrena K. Engstrom, William & Pattis, New Haven, CT, for Plaintiff.

William A. Collier, U.S. Attorney's Office, Hartford, CT, Joseph R. Lipton, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

Plaintiff Rosanna Colman's complaint alleges that she was harassed and sexually

abused by a corrections officer at Danbury Federal Correctional Institution (Danbury–FCI), in violation of her constitutional rights, and was subjected to retaliation when she complained of his actions. Plaintiff further challenges the use of cross-gender pat searches in the sexual trauma unit at FCI as violative of the United States Constitution. Plaintiff's Complaint seeks damages for the assault, the alleged retaliation, failure to train, and failure to properly investigate the incident, alleging violations of the First, Fourth, Fifth, and Eight Amendments, as well as the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981, and state tort claims. Defendant now moves to dismiss all claims except for her Eighth Amendment claim against the alleged assailant, Officer Vazquez.

## Factual Background

Taking the plaintiff's allegations to be true, as the Court must in determining a motion to dismiss, *see Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 409 (2d Cir. 2000), the Complaint reveals the following narrative. Upon her arrival at Danbury–FCI in June of 1995, Ms. Colman, a native of Venezuela, was assigned to the institution's sexual trauma unit, and was forced to submit to pat searches by male guards, including defendant Vazquez. Complaint ¶ 12. Plaintiff alleges that Vazquez made "unauthorized approaches" of a sexual nature towards her, and that she complained to a Danbury–FCI psychiatrist, who in turn informed Lieutenant Meredieth. Complaint ¶ 13. The harassment continued unabated for several months, culminating in a physical assault in March of 1997. Complaint ¶ 16. Ms. Colman again reported the assault to Meredieth, after which she was subjected to taunts and humiliation by Vazquez. Complaint ¶ 21. Ms. Colman alleges that Vazquez has had sexual relationships with other Danbury–

FCI inmates, and that defendants Meredieth and Harding "knew or should have known" that he was unfit for the position, but failed to take any steps to prevent him from committing the alleged assaults. Ms. Colman further alleges that Danbury–FCI's investigation into her complaint was inadequate, as Vazquez was never disciplined, although she repeatedly complained to Meredieth, she continued to come into contact with Vazquez, and was subjected to further harassment by him as a result of her complaints. Ms. Colman's complaint also maintains that she was placed in administrative segregation after she contacted the Venezuelan Embassy for assistance regarding the situation with Vazquez, and that Meredieth conducted a spurious investigation of her claim, although reassuring her that an investigation was underway. Complaint ¶¶ 26–28. Specifically, plaintiff alleges that when Meredieth was replaced by another lieuténant, she discovered that no investigation had actually been conducted, and that the investigating officer to whom she and a witness inmate had previously given a statement was not, in fact, an investigator for the Office of the Inspector General (OIG) as claimed. Complaint ¶ 36.

## Discussion

### A. Withdrawn Claims

The United States has filed a Notice of Substitution (Doc. # 20), contending that the United States has been substituted for the individual defendants on the state law claims under operation of law under the Federal Employees Liability Reform Act, 28 U.S.C. § 2679, since those claims are brought for negligent or wrongful acts of the defendants taken within the scope of their office or employment. *See* 28 U.S.C. § 2679(b)(1). The United States then moved to dismiss plaintiff's state law claims for failure to comply with the Federal Tort Claims Act. Doc. # 18. The individual defendants have moved to dis-

miss plaintiff's constitutional and federal statutory claims, on grounds of qualified immunity. *See* Doc. # 16.

In her opposition to the above motions, plaintiff conceded that she had not pursued her administrative remedies under the Federal Tort Claims Act, and therefore withdrew her state common law claims against the defendants. *See* Mem. in Opp. at 5. Ms. Colman's opposition also indicates that she is withdrawing her VAWA claim in light of *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), and her Fifth Amendment substantive due process claim. *Id.* Accordingly, defendant's motion to substitute (Doc. # 20) is GRANTED, and the United States Motion to Dismiss (Doc. # 18) is GRANTED. What remains for consideration in light of the above concessions is defendants Harding and Meredieth's claim that plaintiff's First, Fourth, and Eighth Amendment claims should be dismissed.

**B. Remaining Claims**

**1. Constitutionality of Pat Searches**

The Complaint alleges that Vazquez violated plaintiff's "right to be free against unreasonable searches and seizures under the Fourth Amendment and to be free from cruel and unusual punishment under the Eighth Amendment," Complaint ¶ 47, and that Warden Harding's authorization of cross-gender pat searches of trauma unit inmates was also a violation of her Fourth and Eighth Amendment rights. Complaint ¶ 51. Defendants argue that because Ms. Colman's Complaint does not allege a violation of clearly established law, they are entitled to qualified immunity. In particular, defendants maintain that since the Eighth Amendment is the "explicit textual source of constitutional protection" for the alleged infringement of a prisoners rights, plaintiff has no claim un-

der the Fourth Amendment. Even if inmates do maintain a residua of Fourth Amendment protection, defendants' argument continues, cross-gender pat searches do not violate the Fourth Amendment, at least not to the extent that it was unreasonable for Warden Harding to believe that such searches were lawful in light of then-established law. Defendants also argue that such a policy is lawful under the Eighth Amendment, or that it was at least reasonable for Harding to think so, thus entitling the defendants to qualified immunity on the Eighth Amendment claim.

■ A government official is entitled to qualified immunity from suit for actions taken as a government official if (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise; (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken. *See Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir. 2000). "Ordinarily, these issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third." *Rohman v. New York City Transit Auth.,* 215 F.3d 208, 214–15 (2d Cir. 2000).

■ As to the first prong of the analysis on plaintiff's Fourth Amendment claim, the Court disagrees that as matter of law an inmate in these circumstances has no claim under this amendment. In support of their argument defendants point to *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), which held that the "Fourth Amendment proscription against unreasonable searches

does not apply within the confines of a prison cell." The Second Circuit, however, has since concluded that inmates do retain a limited right to bodily privacy under the Fourth Amendment. *See Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992) (addressing constitutionality of visual body-cavity searches; concluding that although inmates do retain limited Fourth Amendment rights, prison officials had sufficient justification to intrude upon such interests). Citing *Covino,* other Circuits have reached similar conclusions, expressly disagreeing with the other case on which defendants primarily rely, *Johnson v. Phelan,* 69 F.3d 144, 146 (7th Cir.1995) ("the [F]ourth [A]mendment does not protect privacy interests within prisons."). *See Somers v. Thurman,* 109 F.3d 614, 618 (9th Cir.1997) (discussing cases from the Second, Sixth, and Eleventh Circuits, and noting that "the Seventh Circuit stands alone in its peremptory declaration that prisoners do not retain a right to bodily privacy."). As Ms. Colman does retain some limited Fourth Amendment right to bodily privacy, the Court rejects defendants' legal contention that her only source of constitutional protections is the Eighth Amendment.

Defendants also argue that Ms. Colman was not deprived of her Fourth Amendment rights when she was subjected to a pat search by a guard of the opposite sex, and point to numerous cases from other jurisdictions reaching this conclusion. The defendants' marshaling of this precedent, however, overlooks two important distinctions. First, the procedural posture of the cases cited by the defendants differs markedly from the present case. Every case cited by defendant was decided on summary judgment or after a preliminary injunction hearing or trial, when the reviewing court had the opportunity to evaluate the record to determine whether the regulation or policy allowing such searches was reasonably related to legitimate penological interests, as required *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *See, e.g., Covino,* 967 F.2d at 78 (testimony at preliminary injunction hearing that visual body-cavity searches of male inmates were necessary to preserving order, that contraband had been discovered, and that searches were conducted in the least invasive means possible, established that searches addressed state's legitimate penological interests, and those interests could not be achieved by alternative measure); *Timm v. Gunter,* 917 F.2d 1093, 1099 (8th Cir.1990) (concluding the reasonableness, and thus constitutionality of, policy allowing female guards to pat search and view male prisoners naked, after trial adducing evidence regarding penological justification for the policy, training provided to corrections officers, and statistics regarding number of inmates who objected to the searches); *Grummett v. Rushen,* 779 F.2d 491, 495 (9th Cir.1985) (deciding on summary judgment record that allowing female guards to view male inmates in various stages of undress was not unreasonable, given physical setup of prison, risk to internal security and equal employment opportunities of guards); *Madyun v. Franzen,* 704 F.2d 954 (7th Cir.1983) (deciding on summary judgment that policy allowing frisk search of male inmates by female guards was reasonable); *Smith v. Fairman,* 678 F.2d 52, 54 (7th Cir.1982) (on summary judgment and with affidavit explaining limited nature of the search and training given to prison guards conducting such search, finding that female guards' frisk searches if male inmates are not unconstitutional).

None of the cases cited by defendants, moreover, involved a policy allowing male guards to conduct "pat searches" on female inmates designated by the prison to a special unit for victims of sexual abuse.

First, a number of courts have viewed female inmates' privacy rights vis-a-vis being monitored or searched by male guards as qualitatively different than the same rights asserted by male inmates vis-a-vis female prison guards. For instance, in *Forts v. Ward,* 621 F.2d 1210 (2d Cir.1980), a case involving male guards viewing female inmates while sleeping, changing clothes or using the toilet, the privacy of the female inmates was assumed by the state, the district court and the Second Circuit; the district court's injunction was only reversed because the state had suggested accommodations of those interests, such as the issuance of nighttime garments and allowing the cell windows to be covered for periods at night. 621 F.2d at 1217. *See also Lee v. Downs,* 641 F.2d 1117 (4th Cir.1981) (upholding jury verdict for violation of privacy interests of female inmate who was forced to undress in the presence of male guards). Courts have also found that "women experience unwanted intimate touching by men differently from men subject to comparable touching by women." *Jordan v. Gardner,* 986 F.2d 1521 (9th Cir.1993), discussed *infra.* While these cases have been subject to criticism as reinforcing social stereotypes about gender roles, *see* Note, *The Legitimacy of Cross–Gender Searches and Surveillance in Prisons: Defining an Appropriate and Uniform Review,* 73 Ind. L.J. 959 (1998), they nonetheless make the point that the gender of the inmate and the guard are relevant to the analysis.

Second, the parade of precedent cited by defendant does not address the specific circumstances asserted in this action: allowing male guards to pat search female inmates specially designated by the prison to the Sexual Trauma unit. The prison's assignment of Ms. Colman to a separate section of the prison based on her having suffered sexual abuse in the past evinces a recognition that she may have particular vulnerabilities due to her history. These special concerns sufficiently distinguish this case from the numerous cases cited by defendants involving female guards' observation or pat searching of male inmates.

To accept defendants' argument that no such right exists at this stage in the litigation would require a finding that all types of pat searches are generically lawful, without inquiry into the nature of the search, the circumstances of the inmates, or the penological justifications for the particular policy at issue. While defendants may be correct that the searches in this case were conducted pursuant to a constitutionally valid policy, the Court cannot make this determination on the pleadings alone, in light of the Second Circuit's recognition that inmates still retain some residua of bodily privacy. Resolution of the policies' constitutionality will require consideration of materials outside the pleadings. The Court accordingly rejects defendants' contention that they are entitled to judgment on the pleadings under the first prong of the qualified immunity analysis because the searches alleged cannot violate the Fourth Amendment.

Finally, the defendants contend under the second prong of the qualified immunity analysis that they are entitled to dismissal, because Ms. Colman had no clearly established Fourth Amendment right to be free of cross-gender pat searches in 1997. Defendants are correct that plaintiff points to no controlling Second Circuit authority finding such practices unconstitutional, and as discussed above, there is a wealth of case law from other jurisdictions finding that similar rights to privacy invoked by male inmates were not "clearly established" for qualified immunity purposes. *See, e.g., Somers,* 109 F.3d at 620 (unlawfulness of pat search by female guards on male inmates, if it even was unlawful, "was by no means apparent" in 1993); *see also*

*Letcher v. Turner,* 968 F.2d 508, 510 (5th Cir.1992) (no violation of privacy rights when female staff witnessed strip search of male inmates); *Timm,* 917 F.2d at 1099–1102 (not unconstitutional for female guards to monitor male prisoners during showers and conduct pat searches of male inmates). Again, however, these cases involved the balancing of penological interests against inmates' constitutional rights, rather than a motion to dismiss directed solely to the pleadings. The one case cited by defendants that involved male guards monitoring of female inmates is also distinguishable on the facts. *See Carlin v. Manu,* 72 F.Supp.2d 1177 (D.Or.1999) (while Ninth Circuit may in future recognize that female inmates have right to be free from presence of male guards during strip searches, right was not clearly established in 1996). Central to the *Carlin* court's conclusion was evidence in the summary judgment record showing that the inmates were monitored, rather than touched, on a one-time basis occasioned by an emergency, rather than a policy allowing random, suspicionless searches throughout the day, as is alleged in this case. Nor did *Carlin* involve known victims of sexual abuse, a crucial factor in this Court's assessment of the viability of plaintiff's claims.

Defendants fault plaintiff for failing to allege that the searches were conducted without penological justification, in effect arguing that plaintiff bears the burden of pleading the inapplicability of their affirmative defense. Defendants' support for this proposition can be traced to an isolated sentence in a Ninth Circuit opinion granting a motion to dismiss on qualified immunity grounds. *See Somers,* 109 F.3d at 621. *Somers* involved female guards performing visual body-cavity searches on male inmates, and among the myriad of reasons cited by the court for dismissing an inmate's complaint was the fact that he did not "allege that the searches occurred without any penological justification." 109 F.3d at 622. *Somers* cited no support for that proposition, but even if the Court were to view qualified immunity as imposing additional pleading requirements on a § 1983 plaintiff, by alleging a Fourth Amendment violation plaintiff is by implication claiming that no such justification existed.

Well before the searches at issue in this case occurred, the Supreme Court has noted that "a [prison] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational" or where it is an "exaggerated response" to security concerns. *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. If plaintiff were able to demonstrate that the policy allowing male guards to regularly pat search inmates designated as sexual abuse victims bore no rational connection to a legitimate penological objective, or was an overly restrictive method of achieving a goal when other obvious alternatives were available, qualified immunity would not be available. *See* 482 U.S. at 90, 107 S.Ct. 2254. In other words, the Court cannot determine on the pleadings alone whether the right invoked by the plaintiff was "clearly established," without further factual development regarding the specifics of the pat search policy, the justification for its adoption, the frequency with which inmates in the Sexual Trauma unit are subject to pat searches, and other factors going to the *Turner* balancing. It may well be that discovery will demonstrate Danbury's policy is reasonably related to legitimate security concerns or a penological goal for Trauma Unit inmates, but that determination must await fuller factual development through discovery for summary judgment consideration at the earliest. On the pleadings, the Court can-

not say that defendants are entitled to qualified immunity, and accordingly their motion to dismiss the Fourth Amendment claims regarding cross-gender pat searches are DENIED.

Plaintiff's claim regarding the cross-gender pat searches is also brought under the Eighth Amendment. Courts addressing the constitutionality of cross-gender search or monitoring policies disagree regarding the proper constitutional amendment under which to analyze such claims. *Compare Timm*, 917 F.2d at 1101 (deciding issue under Fourth Amendment using *Turner* standard) *and Moore v. Carwell*, 168 F.3d 234 (5th Cir.1999) (Fourth Amendment rather than Eighth provides correct analysis) *with Jordan v. Gardner*, 986 F.2d 1521 (9th Cir.1993) (finding policy unconstitutional under Eighth Amendment, but noting possibility that it would have been lawful under Fourth Amendment) *and Johnson*, 69 F.3d at 147 (analyzing under both amendments). While plaintiff's claim seems to fall naturally within the ambit of the Fourth Amendment claim, given that it is the constitutionality of a search policy affecting personal privacy and bodily integrity that is at issue, some aspects of her claim resonate under the Eighth Amendment as well, to the extent the searches are alleged to have caused extreme emotional distress due to her circumstances as a sexually traumatized woman. She challenges the cross-gender pat search policy not as applied to the inmate population at large, but only as to the inmates assigned to the sexual trauma unit at Danbury. Amended Complaint ¶ 12.

In a case presenting facts similar to those alleged here, the Ninth Circuit addressed which amendment was the source of constitutional protections, if any, for such claims. *See Jordan*, 986 F.2d at 1524. The Circuit court found unconstitutional a cross-gender pat search policy that had been implemented despite warnings from staff psychologists that it would cause severe emotional distress to inmates who had suffered sexual abuse, and the evidence at trial demonstrated that one inmate had indeed suffered such distress the one day the policy was in effect. 986 F.2d at 1257 (after pat search requiring guard to "push inward and upward when searching the crotch and upper thighs of the inmate," inmate who had been victim of sexual abuse had to have her fingers pried loose from the bars of her cell, and threw up upon return to her cell block). While agreeing that the conduct at issue was plainly a search within the meaning of the Fourth Amendment, the Ninth Circuit chose to analyze the case under the Eighth Amendment, because "the gravamen of the inmates' charge here is that the cross-gender clothed body searches inflict great pain and suffering," thus implicating the prohibition on cruel and unusual punishment contained in the Eighth Amendment. *See id.* at 1254. As the facts alleged in this case appear to fall within the interests protected by both the Fourth and Eighth Amendments, the Court will accordingly analyze whether plaintiff has stated a claim under the Eighth Amendment, and if so, whether defendants are entitled to qualified immunity from such a claim on the pleadings alone.

■ The cruel and unusual punishments clause of the Eighth Amendment is violated by the behavior of prison officials only when that behavior involves the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's

effect. *Sims v. Artuz,* 230 F.3d 14 (2d Cir.2000). Defendants argue that because plaintiff challenges the practice of the pat searches themselves, rather than the way in which particular searches were conducted, plaintiff's claim fails under both the subjective and objective prongs, and further that they are entitled to qualified immunity.

 As to the subjective component, defendants argue that plaintiff's claims against Warden Harding fail because she has failed to plead any facts indicating or allowing the inference that she "wanted to injure plaintiff by authorizing the practice of cross-gender pat searches." Def. Mem. at 12. The Amended Complaint, however, alleges that Harding "permitted and condoned the use of pat searches by male guards in [a] special unit, which is designed to house females who have been subjected to sexual trauma in the past ... in disregard to (sic) the special circumstances of the inmates in the unit and in violation of their privacy rights," Amended Complaint ¶ 12, and that Harding and the other defendants "acted with deliberate indifference, callousness, recklessness and gross negligence with respect to plaintiff's rights" by allowing pat searches. Amended Complaint ¶ 53. Contrary to defendant's suggestion, the plaintiff need not plead that Warden Harding wanted to injure the plaintiff by authorizing such searches, nor that the defendants sought to humiliate her by adopting the policy. In *Jordan,* the Ninth Circuit concluded that the deliberate indifference standard was the appropriate constitutional measure, rather than the higher standard of "malicious and sadistic," because the cross-

gender search policy "was developed over time, with ample opportunity for reflection," and because in contrast to excessive force claims, it did not inflict pain on a one-time basis; "instead, as with standard conditions of confinement, the policy will continue to inflict pain upon the inmates indefinitely." 986 F.2d at 1528. This Court agrees that the conditions of confinement cases are more analogous to the instant claims, and that therefore malice or intent to injure need not be plead. Rather, the operative constitutional standard imposes liability on an official if she is "deliberately indifferent" to the harm, *see Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), or if the official acts or fails to act despite her knowledge of a substantial risk of serious harm. *See Farmer,* 511 U.S. at 836, 114 S.Ct. 1970. The subjective element of an Eighth Amendment violation is therefore adequately alleged in plaintiff's complaint, as she charges Warden Harding with deliberate indifference, and with implementing a policy despite her knowledge of the particular vulnerability of these inmates.[1]

 Defendants also argue that plaintiff has failed to satisfy the objective component of the Eighth Amendment test. The objective component of a cruel-and-unusual-punishment claim focuses on the harm done, but the amount of harm that must be shown depends on the nature of the claim. *See Sims,* 230 F.3d at 20, *citing Hudson,* 503 U.S. at 8, 112 S.Ct. 995. This objective component is "contextual and responsive to contemporary standards of decency," *id.,* and there are significant differences between the harm that must be shown to

---

1. The Court reaches this conclusion despite plaintiff's inexplicable attempts in her brief to subject her complaint to the higher "malice" standard required for excessive force cases. As these pages of the brief are dedicated to a proposition not even presented in the present case (PLRA exhaustion), the Court assumes that their inclusion in the present brief is a cut-and-paste error resulting from the cannibalizing of prior legal briefs and deficient pre-filing proof reading.

support a claim based on prison conditions and the harm that will suffice to support a claimed use of excessive force. To prevail on a claim based on the conditions of his confinement, a prisoner must show "extreme deprivations," "[b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Sims*, 230 F.3d at 20, quoting *Hudson*, 503 U.S. at 9, 112 S.Ct. 995; *see also Blyden v. Mancusi*, 186 F.3d at 263 ("Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim.").

■ Plaintiff alleges that she was assigned to the sexual trauma unit because of her history as a victim of sexual assault, that she was forced to submit to frequent pat searches by male guards in this unit, and that as a result of the conduct of the defendants, she suffered "extreme emotional distress." Amended Complaint ¶¶ 12, 46, 50. Although this allegation does not separate out the pain alleged to have been caused by Vazquez' assault and by the cross-gender pat search, the Court lacks a proper basis for concluding as a matter of law that the cumulative emotional pain felt by female sexual assault victims when forced to submit to regular pat searches by male prison guards cannot constitute a "sufficiently serious" injury to trigger the Eighth Amendment. *See Jordan*, 986 F.2d at 1526 (referring to expert testimony stating that female inmates with prior histories of abuse were likely to feel revictimized by the unwilling submission to intimate contact of their breasts and genitals by men, leading court to conclude that the harm resulting from this unwanted touching was sufficient for the constitutional standard of "pain"). This case is not like *Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir.1997), where the Second Cir-

cuit affirmed the dismissal of a male inmate's complaint asserting "a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent," because "[n]o single incident that he described was severe enough to be 'objectively, sufficiently serious,'" nor were the incidents "cumulatively egregious in the harm they inflicted." 105 F.3d at 861. In contrast, plaintiff here challenges the constitutionality of, in summary, a policy allowing frequent cross-gender pat searches of a female inmate already identified as particularly vulnerable due to prior sexual assault, who allegedly became the victim of a sexual assault by a prison guard who was permitted to "pat" her pursuant to that policy. This claim differs sufficiently from the claim presented in *Boddie* to require further factual development before resolving the constitutional question on its merits. Whether the emotional distress suffered by plaintiff crossed the constitutionally minimum threshold remains a matter for resolution at the earliest on summary judgment.

■ Finally, defendants seek summary judgment on qualified immunity grounds, arguing that even if cross-gender pat searches violate the Eighth Amendment, Harding was reasonable in believing that such a policy was lawful in light of clearly established law. Def. Mem. at 13. The reasonableness of Harding's belief, however, as well as the ultimate legality of the policy, cannot be resolved on the face of the complaint alone, without further evidence regarding how this policy came to be implemented to serve some allegedly legitimate goal. It would not be reasonable for Harding to believe such a policy was lawful, for instance, if it was adopted solely for the purpose of intimidating particular inmates, or for reasons unconnected to security concerns or penological objectives.

The Court therefore rejects defendants' attempts to introduce arguments regarding efficient utilization of staff and the potential for conflict with Title VII, without a record allowing the Court to analyze whether the policy was indeed reasonably connected to such concerns. The motion to dismiss the Eighth Amendment claim on the cross-gender pat search policy is accordingly denied.

### 2. Eighth Amendment—Failure to Protect and Train

Plaintiff claims that defendants Harding and Meredieth are liable under the Eighth Amendment for failing to protect her from defendant Vazquez, and for failing to investigate her complaints about defendant Vazquez and discipline him accordingly. Complaint ¶¶ 21, 39, 43, 53. Plaintiff also alleges that defendant Harding is liable for failing to ensure that Lieutenant Meredieth was properly trained to investigate sexual assault and harassment complaints. Complaint ¶ 39. Defendant seeks dismissal of these claims on grounds of qualified immunity.

■ In the Second Circuit, claims of failure to protect are a subset of Eighth Amendment prison-condition claims, and are subject to the same analysis requiring demonstration of both the objective and subjective components of an Eighth Amendment claim. *See Dawes v. Walker*, 239 F.3d 489, 494 n. 3 (2d Cir.2001). Deliberate indifference in the context of a failure to protect claim requires a showing that the prison official knew that the inmate faced a substantial risk of serious harm, and disregarded that risk by failing to take reasonable measures to abate. *See Farmer*, 511 U.S. at 846, 114 S.Ct. 1970. To avoid Rule 12(b)(6) dismissal, plaintiffs must advance factual allegations sufficient to support both elements. *Id.*

■ Seemingly conceding that the sexual assault described in plaintiff's Complaint meets the objective element of an adequately pled Eighth Amendment violation, defendants focus on the subjective element, arguing that the Complaint fails. to allege sufficient culpable intent, because it does not allege that plaintiff informed Meredieth or Warden Harding about Vazquez threats and harassment prior to the March 1997 assault. Defendant cites a number of cases granting motions to dismiss in cases alleging a failure to protect the inmate from attacks by other inmates, due to the complaint's failure to allege knowledge on the part of corrections officials. *See, e.g., Sims v. Bowen*, No. 96–cv–656, 1998 WL 146409, *3 (N.D.N.Y. March 23, 1998) ("an inmate must inform a correctional officer of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference."). Even assuming that such a standard applies in a case where the alleged assailant is a corrections officer, the Court concludes that the Complaint meets this standard. Although it does not plead that Ms. Colman specifically informed Meredieth of Vazquez' comments and harassment before the March 1997 assault, it does allege that she informed a prison psychiatrist, Dr. Onorato, about an incident in the TV room where Vazquez forcibly kissed her, and that Dr. Onorato told her he would prepare a letter to Meredieth regarding her complaints. Complaint ¶ 14. The Complaint further alleges that after she spoke with Dr. Onorato, defendant Meredieth "called plaintiff in and stated that 'he knew what was going on.'" *Id.* It is inferable from these allegations that Dr. Onorato did indeed write a letter to Meredieth, and that Meredieth's statement to the plaintiff indi-

cated his knowledge of Vazquez' actions.[2]

■ As for plaintiff's failure to investigate and failure to discipline claims, defendant argues that her allegations are wholly conclusory and devoid of factual support, and that she fails to allege the requisite level of culpability—that Harding and Meredieth knowingly disregarded a substantial risk of serious harm. The Court disagrees with the first characterization of plaintiff's allegations, because she alleges that Meredieth conducted a sham investigation of her sexual assault complaint, which included a phony OIG investigator. Complaint ¶ 28. The Court is also unpersuaded that, as a matter of law, repeated, involuntary, harassing and intimidating contact with her alleged assailant cannot constitute a substantial risk of serious harm under the objective prong of the Eighth Amendment. *See, e.g., Boddie,* 105 F.3d at 859 (sexual assault by prison guard may cause severe physical and psychological harm, amounting to violation of Eighth Amendment).

■ Defendants further argue that they are entitled to qualified immunity on this claim because Ms. Colman has failed to come forward with a single case holding that a failure to investigate or discipline a corrections officer after the fact for conduct which has already occurred constituted a violation of clearly established Eighth Amendment law. Plaintiff counters that the allegations in the Complaint are sufficient to state a claim, because they allege

that the individuals responsible for investigation and remedial action were notified, but took no action to reduce the possibility that plaintiff would suffer further harm in the future. While defendants characterize plaintiff's response as identifying the alleged constitutional at too abstract a level of generality, defendants' view of the qualified immunity analysis requires far too specific a factual showing at the pleading stage that clearly established law has been violated. As the Second Circuit recently noted, a factually identical scenario is not required in order to survive a motion seeking dismissal on qualified immunity grounds, *see Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 250–51 (2d Cir.2001), and defendants' focus on the "after the fact" nature of plaintiff's claim could be miscomprehending her theory of the case. The Court sees a construction of the complaint which does not posit an independent Eighth Amendment right to have her assault complaint investigated or her alleged assailant disciplined, but is merely a variant on her failure to protect claim, i.e. even after the fact, defendants took no action and left plaintiff exposed to her assailant's continued harassment. Although the chronology laid out in the Complaint is hardly clear, plaintiff does allege that after having reported the March 1997 assault to Meredieth, who in turn reported it to Harding, plaintiff was still exposed to Vazquez, and in fact Vazquez was at liberty to, and did, harass her, fondle her, spit at her on one occasion, and inform her that

---

**2.** The defendants ask that the Court take judicial notice of plaintiff's first complaint in a prior action regarding this incident, in which she alleged that she reported the March 1997 assault to Dr. Onorato several weeks later, and that Dr. Onorato then advised Meredieth of the assault. However, this is not a case where a pleading from a prior action may be utilized to demonstrate res judicata or issue preclusion, as was the case in *Steinmetz v. Toyota Motor Credit Corp.,* 963 F.Supp. 1294,

1299 (E.D.N.Y.1997), and the other cases cited by defendants. Rather, defendants seek to directly contradict a factual assertion in this complaint, based on an allegation in a previous complaint. While the prior pleading may be utilized at summary judgment or at trial, *see United States v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984), the Court will not consider it in deciding whether plaintiff's current complaint adequately states an Eighth Amendment claim.

# 239

complaints would be to no avail. Comp. ¶ 15, 20. In other words, she alleges that she continued to be in fear of and subject to a substantial risk of serious harm, meaning both the threat of further assaults by Vazquez and the psychological harm occasioned by being forced into continued contact with the alleged perpetrator of a sexual assault, and that despite defendants' awareness of this harm, they disregarded it by failing to investigate her complaint or take steps to prevent further contact with Vazquez. Such a claim states a cognizable Eighth Amendment violation. *See, e.g., Villante v. Dep't of Corrections,* 786 F.2d 516, 523 (2d Cir.1986) (prisoner should be afforded the chance to prove that prison official knew of a pervasive risk of harm due to his complaints about sexual assault prior to the incident giving rise to the cause of action; defendants' action or inaction to prior complaints could amount to deliberate indifference).

As such law was clearly established at the time of the incident in question, defendants are not entitled to qualified immunity without further inquiry into the factual basis of plaintiff's claims and her evidence supporting it. The viability of her theory may be tested on summary judgment, but dismissal under Rule 12(b)(6) on qualified immunity grounds is only proper when "the basis for finding qualified immunity applicable is established by the complaint itself. . . ." *Green v. Maraio,* 722 F.2d 1013, 1019 (2d Cir.1983). As the Complaint here adequately alleges an Eighth Amendment violation for deliberate indifference to a substantial risk of serious harm, defendants' motion to dismiss plaintiff's failure to investigate and failure to protect claims is DENIED.

### 3. First Amendment Retaliation Claim

Plaintiff alleges that "she suffered retaliation from defendant Vazquez for her report of his assaults in violation of First Amendment rights when she was placed in administrative segregation after consulting with her Embassy." Amended Complaint ¶ 49. It is well-established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g., Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To state a retaliation claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (internal quotation and citation omitted). As to the second prong, a prisoner alleging retaliation must show that the protected conduct was "a substantial or motivating factor" behind the alleged retaliatory conduct. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Factors that can lead to an inference of improper or retaliatory motive include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. *See Colon,* 58 F.3d at 872–73.

Because claims of retaliation are easily fabricated, however, courts must "examine prisoners' claims of retaliation with skepticism and particular care," *Colon,* 58 F.3d at 872, and in exception to the general rule, "detailed fact pleading is required to withstand a motion to dismiss." *Beaman v. Coombe,* 1998 WL 382751, 152 F.3d 917 (2d Cir. May 13, 1998) (unpublished disposition), *quoting Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (complaint alleging retaliation in "wholly

conclusory terms" may be dismissed on pleadings). To survive a motion to dismiss, such claims must be "supported by specific and detailed factual allegations," and not stated "in wholly conclusory terms." *Friedl*, 210 F.3d at 85–86 (internal citations omitted).

Defendants argue that the causal link is missing from Ms. Colman's complaint, because she does not allege that her conduct was a substantial or motivating factor in her placement in administrative segregation, or that Vazquez had any personal involvement in her placement. Defendants contend that plaintiff's complaint does not include the higher level of detail required to plead a retaliation claim, and in particular focus on what they view as the complaint's failure to bridge the temporal gap between her protected activity and her placement in administrative of segregation. From the Court's reading of the Amended Complaint, however, defendants again misconstrue plaintiff's theory of liability. While defendants seem to interpret the First Amendment claim as alleging retaliation for reporting Vazquez' conduct to Meredieth in March of 1997, it is apparent to the Court that Ms. Colman links her placement in administrative segregation with her Embassy contacts in June of 1997. The gap between the allegedly protected activity and the retaliation is thus not three months as argued by defendant; instead, Ms. Colman's complaint contains no details regarding the relative timing of these two incidents, claiming only that "[s]hortly after she contacted the Venezuelan Embassy, the plaintiff was placed in administrative segregation for three days and she was denied legal calls during that time period." Amended Complaint ¶ 27, *see also* Amended Complaint ¶ 49 ("The plaintiff suffered retaliation from defendant Vazquez for her report of his assaults in violation of her First Amendment rights when she was placed in administrative segregation after consulting with her Embassy.").

 Notwithstanding this construction of the complaint, the Court concludes that plaintiff has not adequately plead a retaliation claim. While plaintiff's use of the term "shortly" could be read to describe the temporal link between the two events, the inclusion of this word is insufficient to allege any causal connection between her contacts with the Embassy and her placement in administrative segregation. Further, plaintiff's artful use of the passive voice in paragraph 27 of her Amended Complaint cannot conceal the fact that no particular individual is charged with responsibility for her administrative confinement. Plaintiff does not allege that Vazquez, or even Meredieth or Harding, had any role in her confinement, nor does she allege that her protected activity in contacting the Embassy was a substantial or motivating factor in the decision to confine her. Even reading the Amended Complaint in the light most favorable to the plaintiff, at the most it alleges that unknown individuals disciplined her, and that such discipline occurred within a short period of time after she placed a call to the Venezuelan Embassy to complain about Vazquez' conduct. There is no allegation that Vazquez or anyone else knew about her Embassy contact, that the reasons given for placing her in administrative segregation were untrue, or that her placement was in any way motivated by her protected activity. Plaintiff's claim under the First Amendment accordingly fails to meet the heightened pleading standard required for prisoner retaliation claims, and is dismissed.

### Conclusion

The availability of qualified immunity on plaintiff's Fourth and Eighth Amendment

claims regarding the cross-gender pat search policy cannot be resolved until summary judgment at the earliest, and plaintiff's Amended Complaint adequately states a failure to protect Eighth Amendment claim. Her First Amendment retaliation claim, however, is inadequate. As plaintiff was notified of these pleading deficiencies at the May 9, 2000, pre-filing conference, and was given leave to and did file an Amended Complaint to address these deficiencies prior to the filing of defendants' motion, her First Amendment claim is dismissed with prejudice. The defendants' motion to dismiss (Doc. # 16) is accordingly GRANTED in part and DENIED in part. The United States' Motion to Substitute (Doc. # 20) is GRANTED, and the United States Motion to Dismiss (Doc. # 18) is GRANTED.

IT IS SO ORDERED.