Pastor Perafan HOMEN, Petitioner,

v.

Dennis W. HASTY, Warden, Metro-
politan Correctional Center, New
York, New York, Respondent.

No. 01 CIV. 5397(VM).

United States District Court,
S.D. New York.

Oct. 31, 2002.

Pastor Perafan Homen, pro se.

## DECISION AND ORDER

MARRERO, District Judge.

Pastor Perafan Homen ("Homen") filed the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241 (the "Petition"), alleging that his due process rights were violated in a disciplinary hearing conducted by a disciplinary hearing officer ("DHO") at the New York Metropolitan Correctional Center ("MCC") concerning three separate charges of Homen's unauthorized use of a telephone to make three-way, international calls to Colombia. Respondent Dennis Hasty ("Respondent"), Warden of the MCC, filed an opposition to the Petition. For the reasons discussed below, Homen's Petition is denied.

### I. FACTUAL BACKGROUND

Homen was convicted in the Eastern District of New York on one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(A); one count of conspiracy to import cocaine into the United States, in violation of 21 U.S.C. §§ 963 and 960(b)(1); one count of conspiracy to distribute and to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); and four counts of distribution with intent

to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). (*See* Judgment, *United States v. Homen*, Docket No. CR–95–722–01 (TCP), dated May 1, 2001, attached as Ex. B to Declaration of David Kennedy, dated April 26, 2002 ("Kennedy Decl.").)

On April 27, 2001, the Honorable Thomas C. Platt of the Eastern District of New York sentenced Homen to incarceration for thirty years, to be served at the Federal Correctional Institution in Coleman, Florida. (*See id.*) Homen is currently serving his term of imprisonment at his designated facility in Coleman, Florida. At the time of the events in question, however, Homen was incarcerated at the MCC.

While at the MCC, Homen was charged with using a telephone to make unauthorized, three-way international phone calls to Colombia on May 27, 1999, May 28, 1999, and September 17, 1999. These phone calls were all tape recorded by the MCC. The calls on May 27 and May 28 were discovered in the course of a review of Homen's calling activity, triggered by an MCC officer's discovery of Homen's unauthorized, three-way international phone call on September 17, 1999.

On May 27, 1999, Homen dialed (718) 335–1523. (*See* Incident Report No. 716644, dated September 23, 1999, attached as Ex. A to Declaration of Anthony V. Pierro, dated April 26, 2002 ("Pierro Decl.").) Homen spoke with an individual and stated that he would call later to speak with his sister in Colombia. Later on the same day, Homen called (718) 335–1520. An unidentified female answered the phone, pretending to be the operator. Homen asked for a collect call. After a pause, he was transferred through a three-way connection to his daughter in Colombia. Homen spoke with his daughter who asked that he call back on May 28, 1999

for his eldest daughter's birthday. According to the Bureau of Prison's records, Homen's children live in Colombia. (*See* Memorandum by Yanil Abdelhafes, MCC Telephone Monitor, dated September 23, 1999 ("Abdelhafes Memorandum"), attached as Ex. L to Pierro Decl., at 3.)

On May 28, 1999, at 11:19 a.m., Homen again dialed (718) 335–1520. (*See* Incident Report No. 716643, dated September 23, 1999, attached as Ex. B to Pierro Decl.) A female answered and told Homen that the person he was looking for was not there and asked him to call back later. At 2:52 p.m., Homen called the same number. A female answered the phone, again pretending to be the operator. Homen asked for a collect call. After a pause, Homen's daughter came on the line and he wished her a happy birthday.

On September 4, 1999, Homen called the same number. (*See* Abdelhafes Memorandum at 2) A female answered, again pretending to be the operator. Homen asked for a collect call. After a pause, Homen was connected to his son. In the course of Homen's conversation with his son, Homen's son informed his father that he was working on his thesis and preparing to graduate.

On September 11, 1999, at 12:56 p.m., Homen again called (718) 335–1520. A female answered the telephone. Homen asked whether she had time to speak with him. She asked him to call back at 6:00 p.m. At 6:00 p.m., Homen called back and identified himself as "Alberto Vega" and stated "collect call please." The female again pretended to be the operator and connected him to another line where he spoke with an unidentified woman. Homen spoke to this woman about his baby and told her that he heard rumors about her hitting the baby. He also told her not to go to his mother's house.

On September 17, 1999, Homen again dialed (718) 335–1520 and spoke with a female. (*See* Incident Report No. 714849, dated September 17, 1999, attached as Ex. C to Pierro Decl.) She stated to Homen that she was having trouble paying for the phone bills. Homen asked about whether "he was up to date." He then asked, "Well, can I get through?," to which she replied, "Wait awhile." Later that same day, Homen again called (718) 335–1520. A female answered and he asked for a collect call. He was then transferred, after a short pause, to his son.

On September 24, 1999, Homen was served by hand with copies of the incident reports for May 27 and May 28, 1999. On September 17, 1999, Homen was served by hand with a copy of the incident report for September 17, 1999. All three incident reports were referred to the DHO for disciplinary action.

On September 29, 1999, Homen was advised of his rights before the DHO by Case Manager D. Ford. (*See* Forms entitled "Inmates Rights At Discipline Hearing," dated September 29, 1999, attached as Exs. D, E and F to Pierro Decl.) Homen acknowledged those rights by signing each form. At Homen's request, Ricardo Sedano, a full-time Bureau of Prisons employee, was assigned to represent him at the hearing. (*See* DHO Reports, dated December 1, 1999, attached as Exs. H, I and J to Pierro Decl.)[1] Sedano was provided access to the tape recorded conversations as well as the incident reports. Sedano listened to the tapes and translated them himself.[2]

A disciplinary hearing was conducted on October 19, 1999, regarding all three incident reports. At the hearing, Sedano submitted a memorandum for review by the DHO. (*See* Memorandum by Ricardo Sedano, dated September 29, 1999, attached as Ex. G to Pierro Decl.) Sedano's memorandum indicated that he attempted to contact the two witnesses Homen requested. Those witnesses were Homen's son and daughter, Juan Pablo Perafan Homen and Marta Angelica Perafan Homen. In the course of seeking to contact these witnesses, however, Sedano learned that Homen had been making three-way calls.

In the course of his representation of Homen, Sedano dialed (718) 335–1520, the number Homen listed as the witnesses' contact number. A woman identified as "Lisa" answered the phone. Sedano identified himself and told the woman that he needed to speak with Juan Pablo or Marta Angelica, Homen's children. The woman asked the counselor to wait. A moment later she stated that she could not find them. The counselor asked if they had their own number. The woman provided the counselor with the phone number (718) 523–4304. The woman again asked the counselor to hold. At that time, the counselor was transferred to another line. When he was transferred, Sedano noted that there was a delay. He indicated that such delay is what he experiences when making international calls to his family in South America. After the transfer, Sedano spoke with a man named Carlos, who stated that he was Homen's son. Sedano informed Carlos that he needed to speak with Juan Pablo or Marta Angelica. Carlos stated that they were not there, so Sedano told Carlos that he would call back later. After finishing that conversation, Lisa again spoke on the line. Sedano told her he would call back later.

---

1. Because the three incidents for which Homen was served an incident report were similar, the reports of the DHO for each incident are substantially similar.

2. The recorded conversations were in Spanish.

Sedano then called (718) 523–4304 and requested to speak with Marta Angelica. A female answered the phone and identified herself as Marta Angelica. Ms. Angelica identified herself as Homen's ex-wife. Sedano explained that he was trying to get in touch with Juan Pablo. Ms. Angelica stated that as far as she knew, all of Homen's sons lived in Colombia.

Based on the incident reports and Sedano's report, the DHO concluded that Homen had committed the charged violations of prison regulations. (Pierro Decl. Exs. H, I and J.) The tape recordings of the conversations were not played at the hearing. Based on these findings, the DHO deducted seven days of Homen's good conduct time credit and suspended his visiting, commissary and telephone privileges for 365 days. According to relevant regulations of the Federal Bureau of Prisons ("FBOP"), the charges filed against Homen are considered among the low to moderate severity level. (*See* Pierro Decl. at 2 and FBOP Program Statement 5270.07, Inmate Discipline and Special Housing Units, attached as Ex. K to Pierro Decl.) For such an offense, the regulations prescribe that a DHO impose at least one sanction. The regulations list thirteen potential sanctions that may be imposed. (*Id.*)

One such sanction the deduction of good conduct time credit. (*Id.*) For a low to moderate severity offense, a DHO is authorized to deduct up to seven days of a prisoner's good conduct time credit time per year. (*Id.*) However, such a sanction is only permissible when the inmate is found to have committed a second violation

of the same prohibited act within six months. (*Id.*) In the instant case, the DHO found that Homen had engaged in three violations that were low to moderate severity within a five month period. (Pierro Decl. Exs. H, I and J.) As a result, he sanctioned Homen with a deduction of seven days of good conduct time credit. In addition, the DHO imposed a loss of privileges sanction. (*Id.*) Specifically, the DHO suspended Homen's visitation, telephone and commissary privileges for 365 days each. (*Id.*)

Homen submitted the instant petition to the Pro Se Office of this District on August 22, 2000. (Petition at 1.) The Petition raises four objections:

(1) Homen contends that his "due process was violated" because the DHO neither permitted Homen to listen to the tape recordings of the calls, nor did the DHO listen to such calls himself (Petition at 3);

(2) Homen alleges that the incident reports were "inordinately inopportune," in that they were served upon him four months after the violations occurred. (Petition at 4.) Homen further states that the only report served within the alleged "regulation time" was "expunge[d]." (*Id.*) [3]

(3) Homen alleges that he was denied the opportunity to present "exculpatory evidence." (Petition at 4.)

(4) Finally, Homen states that the DHO "did not state that the Prison Investigator's Report that used the (D.H.O.) to find to me guilty, was submitted under oath. This mean[s] that, if it did not done so, my

---

**3.** Homen's characterization of this charge as "expunge[d]" is incorrect. The relevant text of the September 17, 1999 incident report reads "Recommend expunge. UDC [Unit Discipline Committee] listened to tape and it was Sprint operator. 9/24/99—After additional info from SIS [Special Investigative Supervisor] now recommend maximum sanctions. Inmate given new copy 9/24/99." (Pierro Decl. Ex. C.) In other words, the incident report ultimately recommended maximum sanctions after receiving additional information.

due process was violented [sic]." (Petition at 4.)

On March 7, 2002, the Court issued an Order stating that it had determined that the Petition should not be summarily dismissed and that the Government should respond to the Petition. On April 26, 2002, the Government submitted an opposition to Homen's petition.

## II. DISCUSSION

### A. LOSS OF PRIVILEGES

■ As indicated by the DHO's decisions, Homen's visitation, telephone, and commissary privileges were suspended for 365 days each. It is well established that a prisoner cannot challenge the loss of such privileges by way of a habeas corpus petition under 28 U.S.C. § 2241 (" § 2241"). A "challenge [to] disciplinary procedures having only a speculative or incidental effect on the length of [prisoner's] sentence" is not "close to the core of habeas corpus" and cannot be raised under § 2241. *See Sisk v. CSO Branch,* 974 F.2d 116, 117–18 (9th Cir.1992); *see also Georgevich v. Strauss,* 772 F.2d 1078, 1087 (3d Cir.1985) (en banc) ("[T]he fact that a prisoner's success in the litigation might increase the chance for early release does not, in itself, transform the action into one for habeas corpus."); *Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 76 (N.D.N.Y.2001) (noting general rule that sanctions "that result in the loss of commissary and other noncustodial privileges have only a tangential and speculative impact on the imposition of future administrative sentences imposed on a prisoner"). Consequently, Homen's challenge to his loss of privileges must be denied.

### B. LOSS OF GOOD TIME CREDIT

■ It is well established the loss of good time credit as punishment for prison disciplinary offenses implicates a liberty interest protected by the Fourteenth Amendment. *See Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In *Wolff,* the Supreme Court ruled that a disciplinary hearing that results in a revocation of a prisoner's good time credit satisfies the due process requirements of the Fourteenth Amendment if: (1) the prisoner is provided written notice of the disciplinary charges at least twenty-four hours in advance of the hearing; (2) a neutral and detached hearing body conducts the hearing; (3) the prisoner is afforded an opportunity to present evidence and call witnesses as long as the presentation of evidence is not unduly hazardous to institutional safety or correctional goals; (4) the prisoner is granted assistance, if necessary, to understand and prepare a defense; and (5) the factfinder provides a written statement of the evidence relied upon in making its decision and the reasons for the decision. *See id.* at 563–67, 94 S.Ct. 2963; *see also Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (applying *Wolff* criteria in context of parole revocation case).

■ Homen's Petition clearly fails to set out a due process violation under *Wolff.* He received written notice of the disciplinary charges at least twenty-four hours in advance of the hearing on October 19, 1999. (Pierro Decl. Exs. A, B and C.) Homen does not assert, nor does anything in the record indicate, that a neutral and detached body did not conduct the hearing. Homen does not contest that he was granted assistance, and the record plainly indicates that Sedano was appointed as his representative. Finally, the factfinder plainly prepared a written statement of the evidence relied upon in reaching a decision. (Pierro Decl. Exs. H, I and J.)

The only *Wolff* factor under which Homen could possibly raise a claim is wheth-

er he was afforded an opportunity to present evidence and call witnesses. However, the very reason that Homen was unable to call witnesses, that the witnesses in question were in Colombia, itself supports the determination reached by the DHO: that Homen had sought to contact such witnesses by means of an unauthorized, three-way international phone call.

■ Even if Homen's claims were permissible under *Wolff*, the Court concludes that each of his four claims is nonetheless meritless. Homen's first claim is that his "due process was violated" because the DHO did not permit Homen to listen to the tape recordings of the unauthorized phone calls, nor did the DHO listen to such calls himself. (Petition at 3.) Yet Homen's Petition fails to mention that his designated representative, Sedano, did listen to and translate the calls on Homen's behalf. (Pierro Decl. Exs. J, K and L.) Homen had an opportunity to review Sedano's statement, which was prepared two weeks in advance of the disciplinary hearing. (Pierro Decl. Ex. G.) Furthermore, there is no evidence in the record that Homen ever made a formal request to listen to the tapes.[4]

■ Homen's second claim is that the incident reports were "inordinately inopportune," in that they were served upon him four months after the violations occurred. (Petition at 4.) This claim is meritless. The federal regulations setting forth FBOP policies, including the specific federal regulation concerning incident re-

ports, do not require that FBOP personnel serve a prisoner with an incident report within a specific number of days following the alleged incident. *See* 28 C.F.R. § 541.14. All that is required is that a prisoner receive a copy of the charges at least 24 hours prior to the disciplinary hearing. *See* 28 C.F.R. § 541.17(a). Homen does not allege that this requirement was violated.

■ Homen's third claim is that he was denied the opportunity to present "exculpatory evidence." (Petition at 4.) However, Homen ignores the fact that his own representative, Sedano, not only concluded that the tapes were not exculpatory, but also that the recordings were inculpatory, in that the recordings indicated that Homen made unauthorized three-way phone calls. (Pierro Decl. Exs. H, I and J.) Furthermore, Sedano called the number in question himself and concluded that Homen had called this number to make three-way phone calls to Colombia. (Pierro Decl. Ex. G.)

■ Homen's fourth and final claim is that the DHO "did not state that the Prison Investigator's Report that used the (D.H.O.) to find to me guilty, was submitted under oath. This mean that, if it did not done so, my due process was violented [sic]." (Petition at 4.) Contrary to Homen's assertion, there is no regulation or requirement that such written statements be submitted under oath. *See* 28 C.F.R. § 541.17.[5]

---

4. Homen has attached to the Petition an incomplete copy of an incident report for the incident on May 28, 1999, indicating that he wanted to listen to the tapes. (Petition Ex. A.) There is no indication that this version of the incident report was ever given to anyone at MCC. On its face, the incident report attached by Homen was never acted upon. Unlike the copy of the incident report for the same incident provided by the Government (*see* Pierro

Decl. Ex. B), the copy Homen attached to his Petition was not signed by any official at the MCC.

5. Homen cites an alleged regulation indicating that "a prison investigator's report must be submitted under oath." (Petition at 5.) Although Homen fails to so indicate, he is citing 60 *Am.Jur.2d Penal & Correctional Institutions* § 129 (1987), which is not a regula-

■ The Supreme Court has noted that to comport with the "minimum requirements of procedural due process," a DHO's findings must be "supported by some evidence in the record." *Friedl*, 210 F.3d at 85 (quoting *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). Under this standard, a DHO's determination has sufficient support if there is a "modicum" of evidence or "any" evidence in the record to support it. *Zavaro v. Coughlin*, 970 F.2d 1148, 1148–49 (2d Cir.1992).

■ In his Petition, Homen asserts that he could have used tape recordings of the phone calls as "exculpatory evidence." (Petition at 5.) However, even if these tape recordings did contain some exculpatory information, Homen could only prevail on this claim if he established that there was no evidence to support the decision made by the DHO. *See Friedl*, 210 F.3d at 85; *Hill*, 472 U.S. at 454, 105 S.Ct. 2768. In the instant case, the DHO's reports cited the incident reports, the statements of the officers involved, a written statement by an officer who had listened to the tapes, and Sedano's statement of his efforts to find Homen's exculpatory witnesses. (Pi-

erro Decl. Exs. H, I and J.)[6] The Court concludes that such evidence was more than sufficient to support the DHO's deduction of Homen's good time credit as a sanction for his violations of prison regulations.

### III. CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that Homen's petition for a writ of habeas corpus is DENIED.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

---

tion. Moreover, the discussion cited in *Am. Jur.2d* demonstrates that statements under oath may be required only in the case of confidential informants. *See id.* (citing *McCollum v. Williford*, 793 F.2d 903 (7th Cir. 1986)).

6. The Court notes that certain aspects of Sedano's representation present issues not raised in Homen's Petition, nor otherwise discussed in the parties' submissions. Although Homen elected Sedano to represent him, Sedano ultimately provided the DHO with inculpatory information. An inmate's right to assistance is limited, but once a representative is assigned, he or she is to act as his "surrogate—to do what the inmate would have done were he able." *Silva v. T.L. Casey*, 992 F.2d 20, 21 (2d Cir.1993). In the instant case, it is not clear that Homen required assistance, but once Sedano was assigned to Homen, a ques-

tion arises as to whether Sedano should have refrained from providing inculpatory information to the DHO, or whether, under applicable FBOP regulations, he had an obligation to report any such information to MCC authorities. In spite of this, the Court concludes that there was ample evidence, aside from the information provided by Sedano, to support the DHO's conclusion that Homen had made unauthorized three-way phone calls. For example, the Abdelhafes Memorandum and the three incident reports (Pls. Exs. H, I and J), clearly indicated that Homen had violated the prison regulations in question. In light of this evidence, even if Sedano had refrained from providing the DHO with inculpatory information, the Court finds on the record before it that it is extremely likely that the DHO would have reached the same conclusion.